UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPINE AND NEUROSURGERY INSTITUTE,<br><br>Plaintiff,<br><br>v.<br><br>FRESENIUS USA, INC.,<br><br>Defendant. | Case No. 21-cv-03107-EMC<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Docket No. 27 |

Plaintiff California Spine and Neurosurgery Institute ("Cal Spine") has filed suit against Defendant Fresenius Medical Care Holdings, Inc. ("FMCH"), asserting a claim for promissory estoppel. The dispute between the parties relates to medical services that Cal Spine provided to an employee of FMCH known as R.A. R.A. was insured by an employee welfare plan that FMCH sponsored and underwrote. According to Cal Spine, the Plan administrator promised Cal Spine that it would be paid the usual and customary rates for those medical services; however, that promise was not kept; as a result, Cal Spine was underpaid.

Pending before the Court is FMCH's motion for judgment on the pleadings. FMCH contends that the promissory estoppel claim is preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"). Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **DENIES** FMCH's motion.

## I.   FACTUAL & PROCEDURAL BACKGROUND

In the operative first amended complaint ("FAC"), Cal Spine alleges as follows.

FMCH is a healthcare and pharmaceutical company that specializes in dialysis and renal care products. *See* FAC ¶ 4. FMCH sponsors and underwrites an employee welfare plan ("Plan"). *Id.* ¶ 5. A third party, United Healthcare ("UHC"), administers the Plan and acts as an agent of

1  FMCH in doing so. *Id.*

2  R.A. is an employee of FMCH and is a participant in the Plan. *Id.* Because of back and
3  extremity pain, R.A. sought medical treatment from Cal Spine, a company that provides complex
4  surgical services through its principal physician Adebukola Onibokun, M.D. *Id.* ¶ 1. After R.A.
5  failed a trial of conservative management, Dr. Onibokun advised R.A. that surgical intervention
6  was warranted. *Id.* ¶ 6.

7  Cal Spine is an 'out-of-network' provider with respect to UHC. This means that Cal Spine
8  "has not contracted with UHC to participate in its provider networks, or to provide services to its
9  insureds at particular reimbursement rates." *Id.* ¶ 7. Therefore, on June 17, 2020, a staff member
10  at Cal Spine called UHC "to verify the details of R.A.'s insurance coverage and benefits." *Id.* ¶ 8.
11  "A representative of UHC who self-identified as 'Ronny M.' informed [the staff member] that
12  UHC's payment for covered care rendered to R.A. by out-of-network providers would be based on
13  'usual and customary rates.' This was recorded by [the staff member] on an insurance verification
14  form." *Id.* ¶ 8.[1] As it turns out, the Plan includes the following language: "Benefits for in-
15  network services are based on rates negotiated with providers. Out-of-network benefits are based
16  on usual and customary charges for the same or similar services in your geographic area. (You
17  will be responsible for any charges above usual and customary limits. . . .)" Docket No. 36-4
18  (Plan at 14).[2]

19  Subsequently, Cal Spine "sought prior approval of coverage from UHC" for the surgery
20  for R.A. FAC ¶ 11. On June 30, 2020, UHC sent a letter to R.A. indicating that the treatment

---

[1] At the motion hearing, the Court asked the parties to provide this insurance verification form that was referred to in the first amended complaint. Cal Spine submitted the document, and FMCH has made no contention that the document is inauthentic. The document is consistent with its description in the pleadings. Technically, though, a court is restricted to the pleadings when considering a Rule 12(c) motion, and the Court generally does not consider evidence outside of the four corners of the complaint. Here, there is no dispute as to the authenticity of the documents and its relevance, and thus the Court takes judicial notice of it. In any event, because this motion may be decided without the document – solely relying on the pleadings – the Court need not rely on the insurance verification form as it is consistent with the pleadings.

[2] Although a copy of the Plan has been filed under seal, this portion of the Plan does not seem to implicate any confidentiality concerns, particularly because the parties publicly filed a joint statement, *see* Docket No. 37 (joint statement), that contains most of the above language.

sought was medically necessary and was covered by the Plan. *See* Docket No. 39-2 (letter).[3] A copy of the letter was sent to Dr. Onibokun. FAC ¶ 11.

On July 6, 2020, Dr. Onibokun performed the surgery on R.A. *Id.* ¶ 12. Cal Spine billed FMCH $83,000 for these services. *Id.* According to Cal Spine, the "charges reflected the reasonable and customary value of the services at issue." *Id.* ¶ 12. However, FMCH paid Cal Spine $7,320.44 only, contending that the "allowed amount" for Cal Spine's services was $11,123.75, of which $3,803.31 was "chargeable to R.A.'s coinsurance and deductible." *Id.* ¶ 14. Cal Spine alleges that this amount is "far below even the average rates for such services in [its] geographic area" and is especially low considering Dr. Onibokun's qualifications. *Id.* ¶ 15. Cal Spine contends that it would not have performed these surgical services, or even have sought pre-approval of coverage from UHC, if it had known that FMCH would pay this amount. *Id.*

Based on, *inter alia*, the above allegations, Cal Spine asserts a claim for promissory estoppel, contending that FMCH (through its agent, UHC) made a promise to Cal Spine that it would pay usual and customary rates for its services but failed to do so. Cal Spine seeks to recover damages or restitution in the approximate amount of "$75,769.56 (minus any applicable deductibles, coinsurance, or co-payments owed by the patient)" with interest. *Id.* at 6.

## II.   DISCUSSION

### A.   Legal Standard

"After the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is properly granted when, accepting all factual allegations in the complaint as true, there is no issue of

---

[3] The letter confirming coverage may also be incorporated by reference. The doctrine of incorporation by reference "permits a district court to consider documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the . . . pleadings.'" *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (quoting *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994)).

The parties do not dispute that the letter is authentic because the letter is UHC's (FMCH's agent) own document. The complaint refers to the letter – FAC ¶ 11 – and the letter supports Cal Spine's central claim that it received a verification of R.A.'s coverage from UHC.

Although a copy of this letter was filed under seal, this portion of the letter does not appear to implicate any confidentiality concerns.

3

1  material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Chavez*

2  *v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (brackets and internal quotation marks

3  omitted). Like a motion to dismiss under Rule 12(b)(6), a motion under Rule 12(c) challenges the

4  legal sufficiency of the claims asserted in the complaint. *See id.* Indeed, a Rule 12(c) motion is

5  "functionally identical" to a Rule 12(b)(6) motion, and courts apply the "same standard." *Dworkin*

6  *v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989) (explaining that the "principal

7  difference" between Rule 12(b)(6) and Rule 12(c) "is the timing of filing").

8       Judgment on the pleadings should thus be entered when a complaint does not plead

9  "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*,

10  550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual

11  content that allows the court to draw the reasonable inference that the defendant is liable for the

12  misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is

13  not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant

14  has acted unlawfully." *Id.* (internal quotation marks omitted).

15       Here, FMCH does not argue that Cal spine does not have a plausible claim for promissory

16  estoppel. Rather, FMCH contends that the promissory estoppel claim is defective because it is

17  preempted by ERISA. Preemption is an affirmative defense. *See Durham v. Prudential Ins. Co.*

18  *of Am.*, 236 F. Supp. 3d 1140, 1151 (C.D. Cal. 2017) ("ERISA preemption, like all preemption

19  doctrines, is generally an affirmative defense."). At the 12(b)(6) stage – and therefore, implicitly,

20  at the 12(c) stage as well –a defendant may move for dismissal based on an affirmative defense if

21  that defense appears on the face of the complaint. *See, e.g.*, *Asarco, LLC v. Union Pac. R.R. Co.*,

22  765 F.3d 999, 1004 (9th Cir. 2014) ("Dismissal under Rule 12(b)(6) on the basis of an affirmative

23  defense is proper only if the defendant shows some obvious bar to securing relief on the face of

24  the complaint.").

25  B.    ERISA Preemption

27          Congress enacted ERISA to "protect . . . the interests of participants
           in employee benefit plans and their beneficiaries" by setting out
           substantive regulatory requirements for employee benefit plans and
28          to "provid[e] for appropriate remedies, sanctions, and ready access

> to the Federal courts." 29 U.S.C. § 1001(b).  The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans.  To this end, ERISA includes expansive pre-emption provisions, *see* ERISA § 514, 29 U.S.C. § 1144, which are intended to ensure that employee benefit plan regulation would be "exclusively a federal concern."

*Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004).

In the instant case, FMCH relies on the preemption provision contained in § 1144(a) in support of its contention that it is entitled to judgment on the pleadings.  Section 1144(a) provides in relevant part as follows: "the provisions of this title and title IV shall supersede any and all State laws insofar as they may now or hereafter *relate to* any employee benefit plan."[4]  29 U.S.C. § 1144(a) (emphasis added).  Because the "relate to" language could easily be interpreted broadly, "the Supreme Court has sought to craft a functional test for express preemption, instructing that a state law 'relates to' an employee benefit plan if it has either (1) a 'reference to' or (2) a 'connection with' that plan." *Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*, 967 F.3d 218, 226 (3d Cir. 2020); *see also Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319-20 (2016); *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 665 (9th Cir. 2019).

C.  "Reference To"

Here, FMCH does not make any assertion that there is express preemption based on (2), *i.e.*, an impermissible "connection with" the Plan.  Instead, it argues only that there is express preemption because Cal Spine's promissory estoppel claim "refers to" an ERISA plan.  "A state-law claim has a reference to an ERISA plan if it is premised on the existence of an ERISA plan or

---

[4] Preemption based on § 1144(a) is known as express preemption.  Preemption can also be based on 29 U.S.C. § 1132(a), which is known as complete preemption.  Section 1132(a) provides that a civil action may be brought by a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  Although § 1132(a) does not include any language on its face related to preemption, it has been judicially interpreted as providing a basis for complete preemption (also sometimes referred to as field preemption) because ERISA "set[s] forth a comprehensive civil enforcement scheme." *Fossen v. Blue Cross & Blue Shield of Mont., Inc.*, 660 F.3d 1102, 1107 (9th Cir. 2011).  Typically, a defendant relies on complete preemption as a basis for removing a case from state to federal court. *See Marin. Gen. Hosp. v. Modesto & Empire Traction Co.*, 581 F.3d 941, 945 (9th Cir. 2009) (stating that "[c]omplete preemption . . . is 'really a jurisdictional rather than a preemption doctrine, [as it] confers exclusive federal jurisdiction in certain instances where Congress intended to scope of a federal law to be so broad as to entirely replace any state law claim'").  In the instant case, the parties agree that only express preemption is at issue.

5

if the existence of the plan is essential to the claim's survival." *Depot, Inc.*, 915 F.3d at 665 (internal quotation marks omitted). FMCH points out that, in several cases issued by district courts within the Ninth Circuit (at least two involve Cal Spine as the plaintiff), a promissory estoppel or other such similar claim based on facts similar to those in the case at hand has been preempted.

For example, in *California Spine & Neurosurgery Institute v. JP Morgan Chase & Co.*, No. 19-CV-03552-PJH, 2019 WL 7050113 (N.D. Cal. Dec. 23, 2019), Dr. Onibokun performed surgical services on a patient with an employee health insurance plan that was sponsored by the defendant, an investment bank, and administered by UHC. *Id.* at *1. As here, Cal Spine was an out-of-network provider with respect to UHC; Cal Spine called UHC to verify the details of the patient's plan coverage; Cal Spine received an oral representation from UHC that payment for covered care rendered to the patient by out-of-network providers would be based on usual and customary rates; and Cal Spine received a letter from UHC approving coverage. *Id.* at *1-2. After performing surgery and billing the defendants for $77,000, Cal Spine received an "allowed amount" of $2,300 from UHC and subsequently filed suit for promissory estoppel and quantum meruit. *Id.* at *2.

Judge Hamilton held that both of Plaintiff's claims were premised upon the patient's ERISA plan, reasoning as follows:

> Plaintiff's complaint shows that, absent such plan, the promise allegedly made by defendant on August 23, 2018 neither could nor would have been made. Tellingly, plaintiff alleges that it called defendant United Health "to verify the details of BM's insurance coverage and benefits," Compl. ¶ 9, which, as plaintiff itself recognizes, BM was entitled to under his "employee health insurance plan" with defendant JPM, *id.* ¶¶ 4, 6. Plaintiff further recognizes that the specifics of its communication with defendant JPM was recorded "on an insurance verification form." *Id.* ¶ 9. Absent BM's ERISA plan, plaintiff would have no reason to call defendant United Health "to verify" BM's coverage and, incidentally, defendant United Health would not have made any oral representation concerning BM's coverage rights. Without such communication, plaintiff would have no alleged promise to sue upon. Without such promise, plaintiff would have no state law claims. In short, the court finds that plaintiff's state law claims have "reference to" BM's ERISA plan because they are premised upon the existence of such plan and, without such plan, could not state a cause of action under state law.

6

*Id.* at *4. Judge Kim employed similar reasoning in finding ERISA preemption in *California Spine & Neurosurgery Institute v. Penske Automotive Group, Inc.*, No. 3:23-cv-00217-SK (N.D. Cal.) (Docket No. 19).

Not all courts, however, have agreed with, *inter alia*, Judges Hamilton and Kim. In general, these courts have reasoned that there is no express preemption under similar circumstances because the state law claims at issue were ultimately "premised on [the defendant's] alleged representations [to the plaintiff] rather than the plan itself." *Aton Ctr., Inc. v. Nw. Administrators, Inc.*, No. 21CV1843-L-MSB, 2022 WL 4229307, at *2 (S.D. Cal. Sept. 13, 2022); *Summit Est., Inc. v. United Healthcare Ins. Co.*, No. 4:19-CV-06724 YGR, 2020 WL 5436655, at *2 (N.D. Cal. Sept. 10, 2020) ("Here, [plaintiff's] state-law claims are based in tort or equitable concepts and do not necessarily depend[] on the existence or terms of an ERISA plan."); *In re Out of Network Substance Use Disorder Claims against UnitedHealthcare*, No. SACV192075JVSDFMX, 2020 WL 5913855, at *5 (C.D. Cal. July 29, 2020) ("These causes of action are based on Defendants' independent obligation to pay for the services Plaintiffs rendered, and arise from promises Defendants allegedly made."); *Salinas Valley Mem'l Healthcare Sys. v. Envirotech Molded Prod., Inc.*, No. 17-CV-03887-LHK, 2017 WL 5172389, at *6 (N.D. Cal. Nov. 8, 2017) ("California tort law has general application, and do[es] not focus exclusively (or, for that matter, even primarily) upon ERISA plan administration.") (internal quotation marks omitted).

The Ninth Circuit has not directly considered the issue. Respectfully, this Court disagrees with the decisions issued by Judges Hamilton and Kim and instead finds the opposing line of authority more persuasive. Judge Hamilton and Judge Kim's reasoning is largely predicated on factual, but-for causation. In other words, but for the existence of an ERISA plan, the promise allegedly made by defendant would not and could not have been made. But the fact that a plan provides a factual context is not sufficient to implicate ERISA. For a claim to be "premised on an ERISA plan," *Depot*, 915 F.3d at 665, requires more. Whether a claim is premised on an ERISA plan turns on whether the *source* of the plaintiff's claim is predicated on the ERISA plan. In other words, the inquiry is whether the defendant's alleged obligation – as asserted by the plaintiff – is (1) based on the ERISA plan or (2) based on some legal duty independent of the plan. There is

7

ERISA preemption only in the first instance.

At least two circuit courts have taken this approach. *See, e.g.*, *Plastic Surgery*, 967 F.3d at 233 (stating that, "as alleged, it is Aetna's oral offers or oral promises (as the case may be) rather than the terms of the plan that define the scope of Aetna's duty, [and therefore] the plans are not 'critical factor[s] in establishing liability'"); *Mem. Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 250 (5th Cir. 1990) (stating that plaintiff's state law claim was "*independent* of the plan's actual obligations under the terms of the insurance policy") (emphasis added); *cf. Hoag Mem. Hosp. v. Managed Care Adm'rs*, 820 F. Supp. 1232, 1238 (C.D. Cal. 1993) ("When [insurance companies and plan administrators] assure third-party health care providers that the plan will pay for the cost of the care and treatment provided, they are creating independent obligations of the plan."). Notably, The Second and Seventh Circuits have also followed similar lines of reasoning. *See McCulloch Orthopaedic Surgical Servs., PLLC v. Aetna Inc.*, 857 F.3d 141 (2d Cir. 2017) (any legal duty insurer had to reimburse provider for medical services was independent and distinct from its obligations under plan, and, thus, provider's promissory estoppel claim was not preempted on such basis); *Franciscan Skemp Healthcare, Inc. v. Cent. States Joint Bd. Health & Welfare Tr. Fund*, 538 F.3d 594 (7th Cir. 2008) (provider's state law claims arose, not from the plan or its terms, but from the alleged oral representations by plan to provider that participant's treatment expenses would be covered, implicating a legal duty independent of ERISA).[5]

---

[5] Only the Sixth Circuit seems to have taken a contrary position. *See Cromwell v. Equicor–Equitable HCA Corp.*, 944 F.2d 1272 (6th Cir. 1991) (healthcare provider's state law claims of negligent misrepresentation and estoppel were essentially claims for ERISA plan benefits and thus preempted). The *Cromwell* analysis of ERISA preemption is somewhat truncated, resting on the conclusion that the plaintiff's claims were "grounds for the recovery of benefits from the [ERISA] plan," which, if allowed, "would affect the relationship between plan principals by extending coverage beyond the terms of the plan." *Cromwell*, 944 F.2d at 1276. The dissenting justice found this reasoning unpersuasive, noting that "[a] claim of promissory estoppel raised by a third-party health care provider is asserted *precisely because* that provider is not entitled to benefits under the plan," and that "the result of such a boiler-plate unreflective approach to ERISA preemption is to frequently leave deserving claimants without recourse in state or federal court." *Id.* at 1279-1283 (Jones, J. dissenting) (emphasis added). This Court agrees with the dissent and the reasoning of the four other circuits which have addressed the issue.

In any event, *Cromwell* is factually distinguishable from the instant motion, because the court found that the appellants "clearly claimed to be entitled to benefits due them from the… plan

8

This approach is entirely consistent with the structure of ERISA. ERISA governs only certain relationships – between plan and plan member, plan and employer, and employer and employee. *Cf. Or. Teamster Emp'rs Tr. v. Hillsboro Garbage Disposal*, 800 F.3d 1151, 1156 (9th Cir. 2015) (addressing the "connection with" test for express preemption). ERISA does not govern relationships between plan and provider; indeed, a health provider has no standing to sue a plan under ERISA. *See Mem. Hosp.*, 904 F.2d at 249 (noting that "a health care provider does not . . . have independent standing to seek redress under ERISA"). This strongly suggests that by definition, any claim a provider asserts against a plan (or, as here, a plan sponsor), must necessarily be independent of the ERISA plan. One exception, of course, is where a plan member has assigned his rights to the provider, in which case the provider steps into the plan member's shoes and an ERISA claim would exist by virtue of the governed plan-plan member relationship. *See Plastic Surgery*, 967 F.3d at 228.

The above approach is also consistent with ERISA's goals of protecting plan participants. If providers have no recourse under ERISA because of lack of standing or under state law because of preemption, and thus Catch 22, then providers may well be hesitant to accept the risk of nonpayment and may resort to requiring upfront payment by beneficiaries before offering treatment. *See Mem. Hosp.*, 904 F.2d at 247; *see also Lordmann Enters., Inc. v. Equicor, Inc.*, 32 F.3d 1529, 1533 (11th Cir. 1994) ("[H]ealth care providers [must] be able to rely on insurers' representations as to coverage. If ERISA preempts their potential causes of action for misrepresentation, health care providers . . . must either deny care or raise fees to protect themselves against the risk of noncoverage."). This particularly true where the plan contains an anti-assignment provision.[6]

---

as beneficiaries by virtue of the assignment of benefits clause." *Id.* at 1278; *see In Home Health, Inc. v. Prudential Insurance Co. of America*, 101 F.3d 600, 605 (8th Cir.1996) ("*Cromwell* is distinguishable from the present case because Home Health is not seeking benefits as the assignee of an ERISA beneficiary."); *see also Franciscan Skemp*, 538 F.3d at 600 (distinguishing *Cromwell* for the same reason). In the instant motion, as in *In Home Health* and *Franciscan Skemp* and unlike *Cromwell*, Cal Spine does not presently seek benefits as an assignee or "by virtue of an assignment."

[6] As the Third Circuit has pointed out, in recent years, insurers have increasingly inserted anti-assignment provisions into ERISA plans in order to decrease insurers' exposure to ERISA

The Court acknowledges that there are situations where it is plainly obvious that the source of a claim is not based on an ERISA plan. For instance, if there is no valid ERISA plan in place at the time of the underlying events, there is no way that an ERISA plan can be implicated for preemption purposes. *See The Meadows v. Emps. Health Ins.*, 47 F.3d 1006, 1009 (9th Cir. 1995) (state law claims not preempted "because neither The Meadows nor the Friedels had any existing ties to the ERISA plan in 1990;" the Friedels' coverage ceased before the representations were made and before the medical services were provided). Another example is where an insurer or plan administrator makes a fraudulent representation to the provider; if the representation is fraudulent or deceptive, the claim inherently cannot be based on the plan and, instead, the source of the claim must be a representation independent of the plan. *See Mem. Hosp.*, 904 F.2d at 236 (provider's state law claim was not preempted by ERISA § 514(a) where an employer misrepresented to a provider that an employee's wife was covered by the health plan, when in fact she was not covered); *see also Cath. Healthcare W.-Bay Area v. Seafarers Health & Benefits Plan*, 321 F. App'x 563, 564 (9th Cir. 2008) ("[W]here a third party medical provider sues an ERISA plan based on contractual obligations arising directly between the provider and the ERISA plan (*or for misrepresentations of coverage made by the ERISA plan to the provider*), no ERISA-governed relationship is implicated and the claim is not preempted.") (emphasis added). Accordingly, the cases which address this situation admittedly do not answer the question here where there is plan coverage. Nonetheless, the source of the legal duty here is the administrator's promise, not the plan itself.

---

litigation and out-of-network claims. *See Plastic Surgery*, 967 F.3d at 228 (adding that "[a]nti-assignment provisions place out-of-network providers in the unenviable position of having to bill the beneficiary directly and, should payment not be forthcoming, of having either to 'rely on the beneficiary to maintain an ERISA suit' or to sue the beneficiary directly").

Therefore, without an assignment from the beneficiary or an outside agreement with the insurer, providers are left without standing to seek remedies for under-payment. This trend towards anti-assignment provisions has prompted providers to increasingly – as here – seek promises of payment from the insurer in advance of providing medical services. *See id.* at 229 (noting that "out-of-network providers have attempted to secure a new foothold – a promise of payment from the insurer in advance of any services").

10

#### D. Cal Spine's Promissory Estoppel Claim

Having placed a framework on the ERISA preemption issue, the Court now turns to the promissory estoppel claim asserted by Cal Spine and evaluates whether there is preemption of this claim. Bearing in mind that the pleadings must be construed in the light most favorable to the nonmoving party, Cal Spine, and that all reasonable inferences are to be drawn in Cal Spine's favor, *see Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008), the Court finds that Cal Spine has sufficiently alleged a promise was made by UHC (acting as an agent for FMCH). *See* FAC ¶ 8 ("On or about June 17, 2020, Plaintiff's staff contacted UHC by phone to verify the details of R.A.'s insurance coverage and benefits. A representative of UHC who self-identified as 'Ronny M.' informed Plaintiff's staff that UHC's payment for covered care rendered to R.A. by out-of-network providers would be based on 'usual and customary rates.'"). This information was recorded by Cal Spine's staff on an insurance verification form, further supporting the allegation of a promise. *See* FAC ¶ 8. *See also* Docket No. 39 (insurance verification form). And, because Cal Spine's claim is based on a promise independent of the Plan as the reasoning above suggests, there is no ERISA preemption.

FMCH insists still that the source of the promissory estoppel claim was the Plan because the terms of the Plan provide that out-of-network services can be covered (and would be paid at the usual and customary rate). It notes that the situation here is different from that in *Plastic Surgery* where it was clear that there was no coverage for out-of-network services under the plan. *Plastic Surgery*, 967 F.3d at 231. However, while Plastic Surgery is distinguishable for the reasons stated above, even if a promise to pay was made *because* the Plan covered out-of-network providers, the legal source of the claim asserted here is the promise itself even if the reason or motive for the promise was premised on the representative's understanding of the Plan. *Cf. McCulloch*, 857 F.3d at 149 ("The Aetna representative's statements to McCulloch may have been a mere summary of the patient's health care plan and the coverage and benefits that would apply to an 'out-of-network' provider. But McCulloch's claim rests on whether Aetna promised to reimburse him for seventy percent of the [usual and customary] rate, whether he reasonably and foreseeably relied on that promise, and whether he suffered a resulting injury."). Regardless of

11

whether UHC's representation of coverage was correct or incorrect, the cause of action here is based on the representation, not the actual fact of coverage – in other words the promissory estoppel or misrepresentation claim would lie in either instance.

FMCH contends still that, even if the source of the claim is the promise, the fact that the promise incorporated the terms of the Plan – specifically, "usual and customary" rates – provides another basis for establishing that the promissory estoppel claim refers to, or is premised on, the Plan. As an initial matter, the Court notes that, as alleged in the FAC, "usual and customary" is "a term of art in the healthcare and insurance industry" and "refers to the ordinary market rates charged in a geographic area for similar medical services provided under similar circumstances by providers with similar training and expertise." FAC ¶ 9 (also alleging that the California Department of Managed Healthcare has adopted regulations codifying the meaning of "reasonable and customary value," and that FMCH and UHC would be aware of these industry and regulatory uses of the phrase). Thus, it may be argued that there was no incorporation of the terms of the Plan.

But even if UHC, in promising payment at the "usual and customary" meant to incorporate the Plan term, FMCH would fare no better. To be sure, there is case law holding that a claim which requires interpretation of a plan can lead to preemption. *See Plastic Surgery*, 967 F.3d at 230 (stating that a claim is "premised on" an ERISA plan if (1) the claim is predicated on the plan or plan administration (e.g., a claim for benefits due under the plan) and (b) the claim involves construction of the plan or requires interpreting the plan's terms); *McCulloch*, 857 F.3d at 151 (stating that "[provider's] conversation with [insurer] . . . is not governed by the plan's terms or 'inextricably intertwined' with an interpretation of the plan's coverage and benefits"); *DaPonte v. Manfredi Motors, Inc.*, 157 Fed. Appx. 328, 331 (2d Cir. 2005) (finding state law claim preempted where "neither the existence of an ERISA plan nor the interpretation of any such plan's terms is material" to the claim); *cf. Cath. Healthcare*, 321 Fed. App'x at 564 (rejecting defendant's argument that the fact finder would need "to interpret an ERISA plan to determine the terms of the implied contract or the nature of [its] misrepresentations"). But the Fifth and Tenth Circuits have expressly held that where a plan's promise to a provider simply uses the plan as a benchmark for

the rate of payment, that is insufficient to give rise to ERISA preemption. *See Mem. Hosp.*, 904 F.2d at 247 ("The benefits issue arises only to set a benchmark on payments Memorial could have reluctantly relied upon, and to prevent a court from speculating on the proper amount of damages; it is unrelated to the Echols' actual right to benefits under the plan."); *see also Hospice of Metro Denver, Inc. v. Grp. Health Ins. of Oklahoma, Inc.*, 944 F.2d 752, 755 (10th Cir. 1991). In other words, using the plan as a benchmark for the rate of payment is too tenuous a connection to the plan to say that the state law claim is premised on the plan; there is a difference between making a claim for benefits under the plan and invoking the rate of payment as a measure of the moneys owed.

In contrast to the Fifth and Tenth Circuits, the Third Circuit appears to be more open to the possibility that incorporation of payment terms provided for in the plan could be a basis for ERISA preemption. However, the Third Circuit has emphasized that for plan interpretation to justify preemption requires that there be more than just a "cursory examination" of the plan. *Plastic Surgery*, 967 F.3d at 234. In *Plastic Surgery* itself, the Third Circuit noted that "it is not apparent … why more than a cursory review of either [patient's] plan would be required to establish 'a reasonable amount according to the terms of the Plan,' or the 'highest in[-]network level,' for each service." *Id.* at 233. Furthermore, the defendant failed to

> explain why these determinations of in-network payment rates would be particularly complex or require careful study of the intricacies of the plan. To the contrary, the reasonable inference from the pleadings is that, consistent with representations Aetna has made in other cases, the determination is as simple as checking the "usual, customary, and reasonable ('UCR') rate . . . based on an industry-standard schedule" for the services in question, or reviewing the fee schedule attached to Aetna's in-network provider agreements. The former would be precisely the type of "cursory examination of the plan" that we have held does not trigger express preemption, and the latter would not require any examination of the plan, but only of the fee schedule Aetna uses with its providers. Such inquiries do not entail "the sort of exacting, tedious, or duplicative inquiry that the preemption doctrine is intended to bar."

*Id.* at 233-34.

Here, there is similarity to *Plastic Surgery*. FMCH has not shown how incorporation of the plan term "usual and customary" would necessitate more than a cursory examination of the

1  plan. FMCH has the burden of proving its affirmative defense, and the face of the complaint does

2  not indicate that an interpretation of "usual and customary" would require the "'sort of exacting,

3  tedious, or duplicative inquiry that the preemption doctrine is intended to bar.'" *Id.* at 234.

4  Therefore, even if the alleged promise made by UHC (on behalf of FMCH) incorporated the Plan

5  term "usual and customary" for the rate of payment, Cal Spine's promissory estoppel claim still

6  does not make an impermissible "reference to" the plan for purposes of ERISA preemption.

### III. CONCLUSION

For the foregoing reasons, the Court denies the motion for judgment on the pleadings. Because the Court is denying the motion, it need not consider whether Cal Spine might be able to assert a claim based on ERISA, *i.e.*, based on an alleged assignment of rights from R.A. Cal Spine has not asked for leave to assert an ERISA-based claim at this time (so long as its promissory estoppel claim was not preempted). Now that the Court has adjudicated this motion, it encourages the parties to meet and confer and see if they can settle their dispute. Prolonged litigation makes little sense given the damages being sought in this case.

This order disposes of Docket No. 27.

**IT IS SO ORDERED**.

Dated: August 7, 2023

_____
EDWARD M. CHEN
United States District Judge